### 28387. CORNELL *v.* THE STATE.

DECIDED DECEMBER 5, 1940. REHEARING DENIED DECEMBER 20, 1940.

*George B. Culpepper Jr.,* for plaintiff in error.

*W. H. Connor, solicitor-general,* contra.

MACINTYRE, J.  W. A. Cornell was convicted of a felony under Code, § 5-9914, for that he "being a person engaged on his own account in the business of buying products sold by planters and commission merchants on cash sale, to wit, peaches, did then and there buy on sale from G. B. Hoyle, trading as J. H. Hoyle and Son, a planter, twelve hundred and seven (1207) field boxes of peaches, at fifty cents per box, for cash, and did then and there fail and refuse to pay for said peaches, and did dispose of the same without having paid therefor." The defendant's motion for new trial was overruled, and he excepted.

The Code, § 5-9914, provides: "Any person engaged, either on his own account or for others, in the business of buying cotton, corn, rice, crude turpentine, spirits turpentine, rosin, pitch, tar, *or other products sold by planters* and commission merchants on cash sale, who shall buy such articles on sale from a planter or commission merchant for cash, and *shall fail or refuse* to pay for, *and shall make way with or dispose of the same before he shall have paid therefor,* shall be imprisoned in the penitentiary for not less than one year, nor more than five years." (Italics ours.)  (Peaches are one of the products that come under the provisions of this section. *Bank of Oglethorpe* v. *Brooks,* 33 *Ga. App.* 84, 125 S. E. 600). The defendant's punishment was fixed by the jury at from one to three years. The defendant contends that the transaction in question was a credit and not a cash transaction. The question presented is whether the transaction amounted to a cash or a credit sale.

Construing the evidence for the State most strongly in favor of upholding the verdict of guilty, it appears that G. B. Hoyle, the prosecutor, was engaged in the business of farming and peach growing during the year 1938; that he sold the defendant 1207 boxes

of peaches at 50 cents per box, and that the defendant was engaged in buying peaches for himself; that the peaches were delivered to the defendant under a contract between Hoyle and the defendant; that the defendant gave Hoyle a check or draft for the purchase-price of the peaches, and that this check or draft was never paid. Hoyle testified: "The peaches were sold to the defendant on a cash sale. Our agreement as to payment was that what I put up today he would pay for them the next morning. That was the agreement as to these particular peaches. We had a contract to that effect." The peaches in question were delivered to the defendant on July 5, 1938, and the defendant gave Hoyle the check on July 6, 1938. On cross-examination, Hoyle testified: "He was to pay up every morning what we run the day before. I know the contract says he was to get the peaches one day and pay for them the next. That is the contract which you have and under and in that contract it says that he is to pay me each morning." After the check was not paid the prosecutor went to Maryland, August 11, 1938, to see the defendant about the check, and told him it had not been paid and he had come to see him about getting the money. The defendant told Hoyle that he had sold the peaches and that if he ever got the money he would pay the check. "He did not explain why he had not paid it." On the last day of October, 1938, Hoyle went down to Florida to see him again, but the check was still not paid. The present indictment was returned by the grand jury of Upson County on November 14, 1939. The defendant was arrested in Indiana.

The defendant, in his statement to the jury, in effect said that he had a contract with Hoyle for his peaches, and that he, at the instance of Hoyle, drew up the contract on a memorandum. "After he started on his peaches sometimes I would be down at Reynolds until eight or nine o'clock at night, and I would call him and tell him that I would be a little late, and I would tell him to go ahead and load the car for me, or there would be a truck up there and to load that on the truck but if I was going to be too late getting [there] in time enough for the billing I would tell him to bill it for me to Atlanta, Georgia, or Cincinnati, or Potomac Yards, or some place like that. I would go out the next day and we would check up on how much he packed and how much he shipped out and I would give him a check." He stated that he had an arrange-

ment with his bank at home; that he would sell a man a carload of peaches and "I would draw a draft for the amount purchased, the price of the car, and I would deposit the draft in my bank and the bank would give me credit for it as a cash item. . . I had an accumulation of peaches, and on this particular check that I am indicted about Mr. Hoyle said I gave it to him on the 6th of July for peaches delivered on the 5th of July. Mr. Hoyle—I don't know when he deposited the check, but on the 5th of July I had more than enough money in the bank to cover the check on the 5th of July . . and had those checks been presented they would have been taken care of. I gave the check in good faith. I didn't try to steal the peaches. I had been coming up here too long. Had the check been presented the check would have been paid. . . Along about July 7th, . . I sold a carload of peaches to a man named Lancaster, who had an office here, on the strength of government inspection it showed it was U. S. No. 1. That particular car went to Cleveland, Ohio, and was turned down because it did not meet inspection. . . I had 14 cars of peaches that were rejected by people that I had sold them to on the major markets in the East and North. I had drawn drafts against the purchase-price of the cars, and my bank had given me credit for them." After he closed his dealings with Hoyle he took his family to Knoxville, Tennessee, to stay with his wife's family until the Maryland peach season opened two weeks later. He left his forwarding address, Burlington, Maryland, and "When I got there, there was a bunch of mail and telegrams about this trouble which was the first information I had that anything like this had happened. I immediately started sending telegrams and calling on the telephone to different places, trying to unscramble the affair, and it was practically hopeless." He further stated that Mr. Hoyle came to see him in Maryland and that four or five days after Hoyle left he made about $297, and sent Hoyle $270 to apply on the check in question. (The State's evidence showed that this was to cover another check, and not the one involved in the present transaction.) The remainder of the defendant's statement concerned the events which followed in his effort to straighten out the present situation, and of his setbacks in business, which we think is not material to an understanding of this decision.

This is not one of that class of cases where the *specific* intent is

an essential ingredient of the crime and the guilt of the accused depends upon the proof of the specific intent with which the act was committed, as for instance, in cases of assault with intent to murder (*Wright* v. *State,* 168 *Ga.* 690, 148 S. E. 731; *Patterson* v. *State,* 85 *Ga.* 131, 11 S. E. 620, 21 Am. St. R. 152), and in cases of cheating and swindling. *Scott* v. *State,* 46 *Ga. App.* 213 (167 S. E. 210); *Moore* v. *State,* 11 *Ga. App.* 813 (76. S. E. 368). But the crime charged in this case comes under that class of criminal cases in which proof that the defendant intended to do the prohibited act is all that is necessary, for ignorance of the law is no excuse. If the accused did the act, the law presumes he knew it was criminal, and that he knew the natural and necessary consequences that would result. It might also be noted that this statute is to be differentiated from those statutes a violation of which is made penal by the "labor-contract act." Under Code, § 5-9914, the law condemns and makes criminal the failure to pay only where the contract with the planter is for cash and superadded to the failure or refusal to pay is the criminal element that the purchaser makes away with or disposes of the planter's property before he has paid therefor, and thus takes it out of the class of ordinary debts, for the failure to pay which there can be no imprisonment. Thus, it is unnecessary, in order to uphold the constitutionality of the Code section in question, to read into it a specific intent to defraud, and all that is necessary to be proved here is that the defendant did the act prohibited by the legislature. The instant case may be comparable to a case of larceny after trust delegated. *Whitaker* v. *State,* 9 *Ga. App.* 213, 217 (70 S. E. 990). "A crime or misdemeanor shall consist in a violation of a public law in the commission of which there shall be a union or joint operation of act and intention, or criminal negligence." Code, § 26-201. While criminal intent is a necessary element in the commission of the crime charged in this indictment, yet the criminal intent in such connection is simply the intent to do the act which the legislature has prohibited. *Mitchell* v. *State,* 20 *Ga. App.* 778 (2) (93 S. E. 709). Where the cash is paid there is no occasion to invoke Code § 5-9914, under which the indictment here is drawn. The section is applicable only where the agreement to pay cash is not complied with by the buyer. If the sale was to be for cash, merely because the seller did not immediately receive the purchase-price

in actual money with the surrendering of the physical or derivative possession of the property, the statute could none the less be invoked even though it is expressly understood that the payment of the actual money shall not be delayed for any longer period of time than is necessary in the ordinary and usual course of business (*Skinner* v. *Hillis*, supra), otherwise, it seems to us that it would be hard to imagine a case in which the provisions of this section of the Code would be applicable. *Charleston & Western Carolina Ry. Co.* v. *Pope*, 122 *Ga.* 577, 579 (50 S. E. 374); *McCall* v. *Hunter*, 8 *Ga. App.* 612 (70 S. E. 59).

In this case the State did not rely alone on the presumption that the sale was for cash in the absence of any agreement to the contrary, but the State relied on the fact that there was an express agreement that the sale was for cash. Relative to what is a sale of farm produce for cash, Judge Russell, in the *McCall* case, supra, 616, said "that a sale for cash is not restricted to those transactions in which the cash is to be paid upon the instant, or upon delivery of the cotton [peaches], but the term 'sale for cash' includes all of those transactions in which the seller of the cotton [peaches], parts with its possession upon the mutual agreement that the transaction is for a cash consideration, which is to be paid, not at a fixed and definite date agreed upon as one of the conditions precedent to the contract, but as soon as the purchaser may have been enabled, by such means as the seller will permit him to do, to take the necessary steps to produce the currency exactly requisite to close the transaction and complete the purchase." We think the jury were authorized to find under the evidence that the peaches were to be delivered on one day and the defendant, for his own convenience, was to be given during that day to check up the number of cars of peaches delivered to his agent or to himself in the ordinary and usual course of business, and, when he ascertained that the delivery was made and in what amount, he was to pay, on the next day, the actual cash, or give a check or draft, and thus delay payment for no "longer period of time than is necessary, in the ordinary and usual course of business, to reduce negotiable paper to actual cash," or for "such time as may be necessary, and may be agreed upon to be necessary, to enable the purchaser [defendant] (when the seller wishes to afford that convenience) to make needed arrangements to procure the necessary cash." *McCall* v. *Hunter*,

supra. The jury were authorized to find that the seller was not agreeing to deliver the peaches irrespective of payment as in the ordinary case of a sale on credit. Benjamin's Sales of Goods, 134.

The evidence authorized the verdict, and none of the special grounds discloses reversible error.

*Judgment affirmed. Broyles, C. J., concurs. Gardner, J., dissents.*

GARDNER, J., dissenting. The defendant was indicted and convicted for the "offense of a felony as defined in section 5-9914 of the Code of Georgia of 1933 for that the said W. A. Cornell, on the 6th day of July in the year nineteen hundred and thirty-eight, in the State and county aforesaid, did then and there unlawfully and with force and arms and on said date being a person engaged on his own account in the business of buying products sold by planters and commission merchants on cash sale, to wit: peaches, did then and there buy on sale from G. B. Hoyle, trading as J. H. Hoyle and Son, a planter, twelve hundred seven (1207) field boxes of peaches, at fifty cents per box, for cash, and did then and there fail and refuse to pay for said peaches, and did dispose of the same without having paid therefor, contrary to the laws of said State, the good order, peace and dignity thereof." The defendant moved for a new trial on the usual general grounds and several special grounds as to illegal admission or exclusion of evidence and improper charge to the jury, or failure to charge, by the court in certain instances as alleged, none of which are necessary to be set forth except as are required for consideration and discussion hereinafter.

The evidence for the State was substantially as follows: G. B. Hoyle, the prosecutor, testified that during 1938 he was engaged in peach growing, and on July 6, 1938, he sold the defendant, who was engaged in buying peaches for himself, 1207 bushel boxes of Elberta peaches at 50 cents per box, and that "these peaches were delivered to the defendant. . . He sold them and never paid me for them. The peaches were sold to the defendant on a cash sale. Our agreement as to payment was that what I put up today he would pay for them the next morning. That was the agreement as to these particular peaches. We had a contract to that effect . . in writing . . the date of the contract was . . in June because we started in June . . me and him both signed it.

These peaches were bought under this contract . . [and] sold as G. B. Hoyle trading as J. H. Hoyle and Son, but they were my peaches. . . I sold the peaches for cash. He was to pay up every morning what we run the day before. . . That contract says he was to get the peaches one day and pay for them the next. I delivered the defendant the 1207 baskets of peaches . . on the 5th and [he] gave his check on the 6th. . . That check which you have dated July 6th is the check I am talking about, and that check pays for peaches he got July 5. I loaded these peaches on the car for him personally. I guess I billed them out. I billed out some and he billed out some. About this particular car I would not say. . . I do not know where the peaches went. The defendant shipped them away. . . He was handling a crop of peaches in Reynolds, and sometimes he would call me over the telephone and tell me he would be late and to go ahead and bill them out. . . I will swear he sold" this particular car. "I don't know when . . and I don't know where he sold it, and I don't know whether I billed it out or whether he billed it out. Sometimes I . . and sometimes he billed it out. We had a contract to put up the peaches but he did not pay for them until we got through. That $603 covers 1207 boxes of peaches at 50 cents a box. I have been doing business with the defendant three or four years before that, about 1934 or 1935. In this same year, 1938, he got a lot of peaches on the 28th of June. . . The contract also provided about putting up the peaches. I don't remember when I deposited this check. . . I don't remember whether I deposited the check that day or not, . . it might have been the next day. The defendant has taken up one check since this transaction. . . *There was nothing said on this particular car before he bought these peaches with reference to cash.* . . I loaded these peaches on the car under the direction of Mr. Cornell. . . He had the cars placed on my siding, and I loaded them in the car that he directed me to load them in. . . The peaches I billed out were billed out at the defendant's direction. . . That is my stationery. It shows that on the 5th he got so many half-bushels of peaches. It shows that on the 6th, the date charged in the indictment, he got 417 bushels that were delivered by truck. He handled some by car and some by truck. . . This item of 200 bushels by truck means that

sometimes he would send after them by truck. . . Mr. Cornell sent the trucks for the peaches. He told me over the telephone how much to load, and it was by his instructions that I delivered them to the truck[s]. My packing house is . . where the peaches were delivered."

The defendant stated that he had bought peaches from the prosecutor several other seasons, that he had bought the peaches from him for the season of 1938, and that everything had gone along satisfactorily until about the time he took delivery of this particular car of peaches on July 5; that peaches arriving on the market from the previous Saturday and Sunday (no market days) and on the fourth (holiday) together with arrivals on the intervening market days, "simply demolished the market," and that drafts which he had drawn on those to whom he had resold the peaches began being returned unpaid and charged back against his account, without his knowing or being informed that his account had become reduced below the figure necessary to pay the draft on which he was indicted. I quote from his statement: "There was a good many carloads of peaches sold less than the freight charges. I tried to sell practically all the peaches I handled, and in this case there was about . . I would say 85 per cent. of the peaches I shipped were sold f. o. b. here. I would handle them that way. I would sell a man a carload of peaches and I would draw a draft for the amount purchased, the price of the car, and I would deposit the draft in my bank, and the bank would give me credit for it as a cash item. The peaches were going pretty fast from Reynolds and here too. I had an accumulation of peaches, and on this particular check that I am indicted about, Mr. Hoyle said I gave it to him on the 6th of July for peaches delivered on the 5th of July. . . I don't know when he deposited the check, but on the 5th of July I had more than enough money in the bank to cover the check on the 5th of July. I had $1711.44 balance in the bank, and on the 7th of July I had $1773.94, and on the 8th of July I had $1179, and my bank statement shows those balances and had those checks been presented they would have been taken care of. . . Mr. Hoyle finished up . . on July 9th, . . and Mr. Hoyle and I checked up and he gave me a statement of what I had owed him at that time. Also at that time Mr. Hoyle owed me a little money for some baskets, and we made a deduction for that and some

cash I had *advanced*. We checked it all up and I wrote checks for all he said I owed him, and at that time my balance was sufficient to cover them, with drafts I had in the mail going to my bank for credit."

Code, § 5-9914, under which the defendant was indicted and tried provides: "Any person engaged, either on his own account or for others, in the business of buying cotton, corn, rice, crude turpentine, spirits turpentine, rosin, pitch, tar, or other products sold by planters and commission merchants on cash sale, who shall buy such articles on sale from a planter or commission merchant for cash, and shall fail or refuse to pay for, and shall make way with or dispose of the same before he shall have paid therefor, shall be imprisoned in the penitentiary for not less than one year, nor more than five years."

Peaches are a commodity within the contemplation of this section. In *Bank of Oglethorpe* v. *Brooks,* 33 *Ga. App.* 84 (supra), the court interpreted the identical language, but as used in Code, § 96-110, to include "peaches." See *Whitaker* v. *State,* 9 *Ga. App.* 213, 215 (supra), which is authority to the effect that language as used in the statute "would include anything that could be produced on a farm or at an orchard or a dairy."

There are four essential elements which must be proved to sustain a conviction, the first being dependent on the last three, and the last three being interdependent on each other, the lack of any one being fatal. They are (1) there must be an intent to defraud the seller (though this intent is presumed from the facts) ; (2) the seller must sustain loss; (3) on delivery the buyer must fail or refuse to pay for the product, and *in addition thereto* must have made way with or disposed of it before he has paid therefor; and (4) the sale must be a *cash sale,* and the buyer must pay *cash* (or indiciæ accepted in lieu of cash).

First. The intent to injure and defraud, if the three other elements are present, will be conclusively presumed to show a prima facie case from the facts of the case. In *Moore* v. *State,* 12 *Ga. App.* 576, 582 (77 S. E. 1132), the court held: "In cases arising under sections 551 [§ 5-9914] and 553 [§ 5-9916] of the Penal Code, the intent to injure and defraud is conclusively presumed from the facts." When the State has proved each of the other elements, the presumption of intent to defraud arises without the

necessity on the State to prove it as such; and the defendant must then carry the burden of rebutting that presumption. A simple illustration occurs to me. A man might sell a truck-load of peaches to a defendant and permit the truck to be released, and it removed, on the promise of the defendant to go into town two or three miles distant and secure the cash and return immediately for payment. On the failure to return, the intent to defraud would be conclusively presumed to show a prima facie case. But the defendant might rebut that presumption by showing that while returning through the orchard he was assaulted, robbed, and so injured that he was unable to transact any business for several months.

Second. If the third and fourth elements are shown, the seller must show that he has sustained loss. In *Moore* v. *State,* supra, the court held: "As was pointed out in *Whitaker* v. *State,* 9 *Ga. App.* 213 (70 S. E. 990) the common essential element necessary to constitute a crime under both sections 551 [§ 5-9914] and 553 [§ 5-9916] is loss resulting to the seller of certain designated products by reason of the purchaser's wrongful failure to pay for the same." That it is essential that the other two elements (third and fourth), be shown, we quote further from *Moore* v. *State,* supra, when the court, on holding that the "purpose of both sections, 551 and 553, is to protect producers and dealers in farm products from loss, and [that] the gravamen of the offense defined in each section is loss to the seller," said: "If the loss results by reason of the fact *that the sale was for cash* and that the *purchaser made away with or disposed of the product before he paid for it,* the case would fall under section 551 [Code, § 5-9914]." (Italics mine.) But, under § 5-9914, the loss will be implied when the State shows that, on a cash sale, the purchaser, on taking delivery, failed or refused to pay and the *buyer has made way with or disposed of the product.* In *Whitaker* v. *State,* 9 *Ga. App.* 213, 216 (supra), the court held: "From this making way with or disposing of the property, and refusal to pay, the law conclusively presumes that loss has accrued to the seller; and the State is not required directly to prove loss, because loss is implied."

Third. It is essential that the buyer upon delivery of the product, failed or refused to pay for it, and *in addition thereto* made way with or disposed of it *before* he paid therefor. It is

not sufficient simply that the buyer fails or refuses to pay for the product which he buys or agrees to buy, but that he takes delivery and thereupon makes way with or disposes of it before he pays therefor. The taking delivery and the making way with or disposing of the product, before he pays for it, is superimposed upon the failure or refusal to pay. The court, in *Whitaker* v. *State,* supra, held: "In both statutes it was necessary for the legislature to insert as elements certain facts (necessary to be proved) which would distinguish the crimes from an ordinary refusal to pay a debt; for otherwise the law would be unconstitutional and contrary to the fundamental law, which forbids imprisonment for debt. And so in section 551 there is super-added to the refusal to pay (which of itself could not be a crime) the element that it must appear that the purchaser made way with or disposed of the property before he paid for it."

Fourth. It is absolutely necessary that the fourth element be present, that the sale must be on a *cash* sale and the buyer must pay cash. On the requirement as to the species of payment, payment may be in anything of value acceptable as such, or in checks, drafts, or any negotiable order or exchange calling for payment in the course of business; and, unless accepted unconditionally as payment, will not be considered as such until actual payment so as to render the sale any the less a *cash* sale. "Checks are expected to be paid on presentation. Reliance on that expectation, the receipt of the check, depositing it for collection or credit, . . does not make the check payment until it is itself actually paid." *Charleston &c. Railway Co.* v. *Pope,* 122 *Ga.* 577, 580 (supra). "A draft is not payment, until itself paid, unless there is evidence that it was the intent of the parties that it should be so treated." *Kinard* v. *First National Bank of Sylvester,* 125 *Ga.* 228 (53 S. E. 1018, 114 Am. St. R. 201); *Stewart Paper Mfg. Co.* v. *Rau,* 92 *Ga.* 511 (2) (17 S. E. 748); *Council* v. *Nunn,* 41 *Ga. App.* 407, 411 (153 S. E. 234). That the sale must be a *cash* one is absolute and unconditional. Credit extended, indulged, or acquired or *contracted for,* would remove the transaction from the operation of the statute. The *quantum* of time the credit is extended would be immaterial. While in contemplation of the statute the payment must be concurrent with sale and delivery, yet delay or deferment in receiving the actual cash will not for that reason necessarily

render the sale any the less for cash. To this effect it was held in *Butler* v. *Moseley,* 14 *Ga. App.* 288, 289 (80 S. E. 789) : "A sale would be for cash although payment of the actual money might be delayed for a period necessary in the ordinary and usual course of business to reduce negotiable paper to cash." In *McCall* v. *Hunter,* 8 *Ga. App.* 612 (2) (supra), the court held that the term, "on cash sale" (and as provided by the statute we now have under consideration), "is not confined to sales where the payment of actual money is to be made immediately, but includes all sales where it is expressly understood that the payment of actual money shall not be delayed for any longer period of time than is necessary, in the ordinary and usual course of business, to reduce negotiable paper to actual cash, and also includes such time as may be necessary, and may be agreed upon to be necessary, to enable the purchaser (when the seller wishes to afford that convenience) to make needed arrangements to procure the necessary cash. The fact that the seller may give a purchaser an opportunity of getting the cash and a limited period of time in which to procure it, where it is expressly understood that the seller is to receive the cash, does not defeat the rights of a planter or commission merchant, as conferred by that section of the Code."

In *Stapleton* v. *Dismukes,* 43 *Ga. App.* 611 (159 S. E. 768), the court, ruling as to what constitutes such a cash sale as would render it within the protective terms of a similar statute (Code, § 96-110), approved a former ruling that "a sale so intended by the parties is no less a cash sale because actual payment of the cash is not made concurrently with delivery, but is temporarily deferred to meet the convenience of the parties in making a settlement." In *Exchange Bank* v. *Horne-Andrews Commission Co.,* 20 *Ga. App.* 320, 322 (93 S. E. 113), it was held that, where in conformity with a custom between the warehouse and the buyer to allow two days from the purchase of the cotton to mark it, get it from the warehouse, and obtain a bill of lading covering the cotton, checks were permitted to be sent the buyers two days after the delivery of certain lots of cotton, and three days in one of these instances, the sales in question were none the less for cash. In *Charleston &c. Ry. Co.* v. *Pope,* supra, it was held: "A cash sale of cotton delivered on Saturday is not converted into a credit sale because, on the Monday following, the commission merchant receives a check for the pur-

chase-money, deposits the check in bank, draws against the account thus increased, and marks the bill 'Paid.'" The court further observed (page 580) that though there was a by-law of a cotton exchange as to payments subsequent to deliveries, "there is nothing in this record to show that the contract of sale was to be governed by the rules of the exchange rather than by the laws of the State. Delivery on Saturday, check on Monday, and marking the bill 'Paid' were entirely consistent with the idea of a cash sale." Several days allowed a purchaser to make good a dishonored check does not necessarily convert the cash sale into a credit sale. *Graham* v. *John Flannery Co., 32 Ga. App.* 713 (2) (124 S. E. 729).

While I have been treating of those instances where credit had not been extended or indulged (where credit was not purchased), *it does not follow that credit may not be contracted for by the buyer.* Where contracts of purchase are made and they are *silent* upon the subject, payment must be upon delivery of the goods. Inner Shoe Tire Co. *v.* Treadway, 286 Fed. 838; Hudson *v.* Barrett, 16 Ala. App. 278 (77 So. 428); Hart-Wood Lumber Co. *v.* Bonaly, 192 Cal. 180 (219 Pac. 432); Wessel *v.* Seminole Phosphate Co., 13 Fed. 2d, 999. And where *nothing is said* concerning the time of payment, the transaction is understood to be a cash sale. *Long* v. *Dye, 42 Ga. App.* 726 (157 S. E. 359); *Freeman* v. *Stedham, 34 Ga. App.* 143 (2) (128 S. E. 702). Sales are presumably for cash, in the absence of a contrary agreement. Hamilton *v.* O'Rear, 224 Ala. 625 (141 So. 565). (And we think that the "absence of" could be "contract" as to how the money or when the payment should be made.) The law implies that property' is sold for cash in the *absence of a contrary agreement.* (Same observation as above.) Edwards *v.* Hastings Distributing Co., 107 Neb. 621 (186 N. W. 980); Miller *v.* Direct Lumber Co., 207 Ala. 338 (92 So. 473). All sales are for cash *unless the parties make a different contract,* or so conduct themselves as to indicate that the sale is not for cash. Loval *v.* Wolf, 179 Ala. 505 (60 So. 298); Silver *v.* Moore, 109 Me. 505 (84 Atl. 1072). "Where a sale of goods has been made, *in the absence* of proof of either *contract* or custom concerning payment therefor, the presumption is that the amount is payable on delivery." *McCarthy* v. *Nixon Grocery Co., 126 Ga.* 762 (56 S. E. 72). I again quote from *McCall* v. *Hunter,* supra, in which the court was dealing with the law as applied to

Code, § 96-110, but which I think applies with like force to the provisions of § 5-9914 (under which the defendant is indicted) : "Where no time is specified for payment of an article purchased, the sale is presumably for a cash consideration; and where it appears that a planter or a commission merchant has sold any of the products mentioned in section 3546 [Code, § 96-110] of the Civil Code of 1895, this presumption will prevail, *in the absence of manifest proof that there was an agreement to the effect that payment was to be postponed as a part of the consideration, as an essential element of the contract of sale.*" (Italics mine.) I think that if such a contract as indicated in the above italics is made, it may expressly or by necessary implication relinquish or waive (*Mason* v. *Farmers Cotton-Oil Co.,* 29 *Ga. App.* 418 (2), 116 S. E. 123) the protective provisions of Code, § 5-9914, with reference to cash sales, and notwithstanding the provisions of the statute be a *contract* for the *credit,* and *so make that condition a provision of the contract,* regardless of the *quantum* of time as such thus *purchased.* Whether or not the sale is one for cash is a question of law for the court upon the facts, and not a question of fact for the jury. *Butler* v. *Moseley,* supra.

I turn now to the issues involved, in the light of the foregoing principles. The prosecutor testified that "the peaches were sold to the defendant on a cash sale," and that "there was nothing said on this particular car before he bought these peaches [about which the defendant was indicted] with reference to cash." Of course, if that were all, the presumption arose that the peaches were being sold for cash. An examination of the record will show that, according to the testimony for the State, the defendant, in June, 1938, entered into a *written* contract of purchase with the prosecutor, a planter, for his peach crop for the season of 1938 (the defendant having formerly bought two other seasons of peaches from the prosecutor), at 50 cents per bushel basket, which contract both parties signed. While no copy of the contract appears in the record, the prosecutor testified that the "contract says he was to get the peaches one day and pay for them the next," and that "these peaches were bought under this contract;" also, that the "contract provided about putting up the peaches;" and that he "loaded these peaches [about which the indictment arose] on the car for him personally." The prosecutor also testified that he delivered the

particular car in question to the defendant on July 5, and the defendant gave his check for them on July 6, which check on being deposited for collection in due course of business was returned unpaid. It accordingly appears that the waiting over to the next day for payment of peaches delivered on any particular day, and as to the car in question, was not grace or indulgence allowed the defendant by the prosecutor, for the *convenience* in any particular of the defendant, but that the waiting over was in accordance with the provisions of the contract, either by express terms or necessary implication, which secured to the defendant the right to wait. "The contract says he was to get the peaches one day and pay for them the next."

This provision of the contract was equally as valid as any other provision of the contract—for instance as that the "contract provided about putting up the peaches," and the contract was as binding upon the one party as upon the other. If the contract had been silent the law would have implied that the transaction or transactions were for cash, with payment to be made concurrently with the sale or sales. In fact, the purchaser could *not have demanded* pay before delivering the goods. "Unless credit is specifically agreed on . . the purchase money is due immediately, and the seller may demand payment before delivering the goods." Code, § 96-106. Could the prosecutor at any time during the season of 1938, as to any transaction under this contract they both had signed, or as to the particular transaction in question, have refused to make delivery unless the defendant first paid "cash on the day of the delivery or at the time of literal delivery?" I think not. Had he so refused it would have been a breach of their contract, as much so as a failure or refusal to pay on the day after (as actually contracted or arbitrarily ten days after) by the defendant, would have been a breach. The provision as to a day was "specifically agreed on." (Code, § 96-106.) The consideration therefor was not wanting, or lacking in fact or in law, it being supported by the same consideration as supported the contract in any and all of its other provisions.

I think it matters not that the quantum of time was only a day, or such time as might extend from one day into the business morning of the next day following the day of delivery. Credit may have appeared more real, had the provision specified seven days or

218

ten days or thirty days, or the day the entire season was over, that the defendant would have the right to wait before making payment after a delivery, but the *difference is in degree only and not in fact.* For all practical purposes the contract as made provided largely other benefits to the seller as could have been realized, had the money been paid "literally on delivery," such as paying for picking, packing, and other and similar expenses. On the other hand, though the buyer had contracted for only a "day" he nevertheless realized in a business way certain benefits accruing as readily in a day of credit as he would have had had he made it a week or greater period than the day as was the provision of the contract. According to the defendant's statement, coincident with taking delivery he could, and did, immediately sell his customers or others in different parts of the country, and immediately draw on them for the sales price, and forward instantly the draft to his bank for sight credit on which the check he gave the *next day* might be paid.

The evidence demands a finding that the contract, in providing for delivery, did so without any hinder or reservation on the part of the *seller*. In fact, the seller often aided the delivery and *disposition* of a sale (well knowing he would not be paid until the *next* day, and could not under the contract force the buyer to pay earlier) by billing a car to a purchaser as designated by the defendant. Such deliveries became absolute and irrevocable as against the prosecutor. Code, § 96-110. And the making way with or disposal of the property, was as irrevocable as against the *next* day as it would have been had the time purchased been fifteen or thirty days. The characterizing feature of § 5-9914, as against § 5-9916, is that the feature of disposing of or making way with the property *is that* which is being penalized as a felony in the former statute, when in the latter statute, though such disposition has been also made, the law only makes penal the *failure to pay* the cash, or the check or other negotiable payment in lieu of the cash, *and makes that a misdemeanor.* Can it be said that the defendant committed felonious acts in disposing of his purchases, often with the aid of the prosecutor, when he did not *first* pay for the purchase, when his failure to pay the indiciæ given in payment on the *next* day was based on a contractual right, or his *refusal* to pay, equally so based? Of course the failure to pay the day *after* (or to pay a check given the day after) the purchase and disposition would relate back as a

part of the transaction for cash as of the day before, were the transaction one for cash and the permission to pay a day later was the grace extended by the seller in those instances heretofore discussed *when not based on contract purchase of credit.* But where the failure or refusal to pay concurrently with the delivery is based upon contract, such failure is not the basis of crime. Had the seller *wished* to avail himself of the protective provisions of Code, § 5-9914, he could have done so simply by *refusing* to contract his peaches, except he be paid cash concurrently with the delivery. It was held in United Canneries Co. *v.* Seelye, 48 Cal. App. 747 (192 Pac. 341), that where a contract for the sale of fruit was *silent as to the time of payment,* the buyer must, under the Civil Code, § 1657, *pay at the time of delivery,* and particularly was this true where the seller demanded that there be *stricken from the contract* provisions for payment *after* delivery.

Even were it contended, or conceded, that the real inspiration to the waiting until the next day was only to better allow the parties to check up as to any particular day of purchases, thereby amounting to special convenience to the defendant in that his continual presence was not required, it would not change or alter the fact that the *right to wait* was not a matter of grace extended by the seller, but a matter of *acquirement* under the written contract between them, to which both subscribed, the validity of which being unquestioned. When once purchased, the *reason* for the purchase of credit becomes immaterial. I think the third element (as to the illegal disposition of the goods before paying for them as charged in the indictment) and the fourth element (as to the sale being one for cash) were lacking, that no intent to defraud arose on the facts of the case, and that a verdict for the defendant was demanded. While I think, under this view of the case on the general grounds, that the special assignments may have shown error, they were, if errors, harmless, and merit no discussion.

### ON MOTION FOR REHEARING.

GARDNER, J. The motion for rehearing should be granted. In addition to the reasons set forth in the foregoing dissent (and as indicated below), I think, in the light of the judgment of the majority of the court, that the trial court erred in not charging the jury relatively to those special assignments of error as to the admissibility of evidence, and in certain excerpts from the charge

to the jury, unnecessary here to be related. Even though it be held by the majority of the court that the sale in this case was one for cash, it yet remained necessary for the State to show that the element of failure to pay *before* removal and disposition was criminal within Code, § 5-9914. When the State showed the facts of failure to pay and removal before payment, the defendant, in rebuttal, had the right to show that the removal was in accordance with the provision of a valid contract specifically allowing removal *before* payment for the product, thereby rebutting the element of criminal removal under Code, § 5-9914, and leaving the offense, if any, of which the defendant may have been charged, that of a misdemeanor as defined by Code, § 5-9916, making it penal only as to the failure of payment (in this case) of the check, the subject-matter of the indictment.

Furthermore, I think, in the light of the judgment of the majority of the court, that, upon the State showing a cash sale, removal or disposal before payment, and loss to the seller, the defendant had the right to rebut the presumption of intent to defraud which arose on proof of these elements. While the State did not have to prove, *as such,* the intent to defraud, but could rely on the presumption as to the intent, it did not follow that this presumption was not rebuttable. It did not follow that there was a hiatus or break in the trial when the defendant could not defend against this presumption, and that he had nothing left to him but the verdict of guilt and sentence of the court. Even though the literal facts shown by the State, supporting the necessary elements, gave rise to the presumption, he had the right to overcome that presumption by rebuttal facts as to the intent, showing the lack of existence of intent to defraud, notwithstanding the proved facts by the State supporting the elements and giving rise to the presumption remained themselves unchallenged. In the field of criminal jurisprudence, and certainly in our State, the intent to commit crime, whether arising by proof of such intent, or by presumption upon proved facts, is always rebuttable. Especially is this true of offenses arising from commercial transactions, where the facts made penal are malum prohibitum, instead of malum in se. In the latter class of cases the evil is inherent because of the nature of the act. In the former it is criminal because of the statute regulating the conduct. Under our present constitution, in the malum

prohibitum class of cases the legislature can go no further than to lay down a rule of evidence providing that the proof of a certain state of facts is sufficient to raise a presumption of intent to commit the crime, and can not go further in any commercial transaction. If it did go further it would have the effect of imprisonment for debt.